**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 15-cv-00641-WYD-NYW

**CAROLYN S. RAUP,**

     Plaintiff,

v.

**VAIL SUMMIT RESORTS, INC.,**

     Defendant.

_____

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

_____

     Plaintiff responds to and opposes defendant, Vail Summit Resorts, Inc.'s ("Vail's")

Motion for Summary Judgment as follows:

## I.   Plaintiff's Allegations and Overview

     Plaintiff's allegations are well known to this court and described by this court in its

February 1, 2016 order granting in part defendant's motion to dismiss. [Doc. 45]. Essentially

though, this case involves Plaintiff's complaint that on June 25, 2013, she boarded a chairlift

owned and operated by Vail, intending to ride it to the top and back down again without getting

off, as she had in 2012. When she reached the top, however, she and her two companions were

suddenly confronted by commands from one of two Vail's employees who were lift operators,

James Ferrara ("Ferrara") and Erik Sims ("Sims), motioning and yelling at them to immediately

raise the foot rest and get off the chair.  They had waited until the chair was very close to the

unboarding line to do such.  Plaintiff and her companions were obviously confused at that point

and well past the point where it was safe to unload. In an effort to comply with their commands, however, they nevertheless abruptly raised the foot rest, which caused plaintiff to lose one of her sandals, and then as the chair was past the unloading bar and proceeding down a descending ramp, she managed to hop off the chair, stumble, and become trapped on the left side of the unloading ramp as the chair started circling around to the left to go back down the mountain, which caused the chair to strike her and propel her off the ramp on the left side, where she landed on her left side, and suffered severe injuries to her leg, including multiple fractures and a dislocation of her ankle.

Based upon these facts, Plaintiff's first claim against Vail is pursuant to the Landowner's Liability Statute at § 13-21-115, C.R.S. (Count I), contending that pursuant to the definition of such at subsection (3)(c), she was an "invitee," and that Vail's actions, through its operator and otherwise constituted an "unreasonable failure to exercise reasonable care to protect her  against dangers of which [Vail] knew or should have known." (*Id.* ¶ 26). Plaintiff asserted as well claims for negligence against Vail, including *per se* negligence (Count II).

Based upon Vail's Motion to dismiss, however, this court dismissed plaintiff's Second Claim for Relief for negligence, including negligence *per se* (Count II).

Thus, the operative issue remaining as asserted in plaintiff's First Claim for Relief is whether Vail's actions or lack thereof constituted a violation of its obligations to Raup, as an invitee, as set forth in the landowner's liability statute at §13-21-115(3)(c), C.R.S., and specifically, whether Vail's actions, through its operators and otherwise, constituted an "unreasonable failure to exercise reasonable care to protect [plaintiff] against dangers of which [Vail] actually knew or should have known."

2

Vail makes two contentions in its motion for summary judgment, as follows:

1.     Plaintiff cannot establish that Vail failed to exercise reasonable care to protect plaintiff against dangers which Vail actually knew or should have known," without expert testimony; and

2.     Despite the fact that plaintiff did not sign a waiver agreement, by virtue of the language on the reverse side of her lift ticket, plaintiff entered into a binding waiver agreement with Vail releasing them from all liability regarding their negligence.

## II. Standard of Review

Summary judgment may be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit." *E.E.O.C. v. Horizon/CMS Healthcare Corp*., 220 F.3d 1184, 1190 (10th Cir. 2000).  "A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *Id.*

When applying the summary judgment standard, the court must "'view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.'" *Id.* (quotation omitted).  In other words, "'[t]he evidence of the nonmovant is to be believed, and all justifiable inferences to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. ____, 134 S. Ct. 1861, 1863, 188 L. Ed. 2d 895 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  "All doubts must be resolved in favor of the existence of triable issues of fact. *Boren v. Sw. Bell Tel. Co*., 933 F.2d 891, 892

(10th Cir. 1991).

### III. Response to Movant's Statement of Material Facts

#### A.    Plaintiff's Direct Response to Vail's Statement of Material Facts

Vail's "statement of material facts" is not an accurate statement of the undisputed material facts. It is instead a listing of selected facts that Vail cares to emphasize, presented in a light most favorable to the proponent of the motion (Vail) and not vice versa. Pursuant to this court's division rules concerning responses to motions for summary judgment, the following is plaintiff's direct response to Vail's Statement of Material Facts" using the paragraph numbers utilized by Vail:

1.      Admitted.

2.      Admitted.

3.      Admitted.  As emphasized in this regard, however, and as discussed below, although plaintiff and her daughter signed a release of liability agreement in 2012, they did not do such in 2013. (See Plf.'s Version of Facts, below, ¶2).

4.      Plaintiff agrees that the 2012 release agreement likely was an effective release contract between her and Vail, when she utilized the chairlift in **2012**.

5.      Denied.  Vail exaggerates plaintiff's testimony.  Her exact testimony was that "there's risk in everything you do.  Getting in a car is a risk." (Ex. A at 39:1-17).

6.      Admitted.  It is emphasized in this regard, however, that it was the Pyles who purchased the lift tickets and not plaintiff. (See Plf.'s Version of Facts, ¶3).

7.      Admitted.

8.      As we discuss below, whether plaintiff looked at the front of the ticket before she

rode the lift is questionable, since it was the Pyles who purchased the lift tickets and not plaintiff. (*Id*.).

9.      Plaintiff admits that on the very bottom of the front side of the lift ticket she utilized, there is printed in tiny 5 point font, the following (using 5 point font): "Important Warning on Reverse." (See Plf.'s Version of Facts, ¶4).

10.     The back of the ticket includes the language set forth in Vail's motion.  Again, however, it is not in the 12 pt. font presented by Vail, but in likely 5 point font. (Id.).

11.     Admitted.

12.     Admitted.

13.     Admitted. The sign, however, speaks for itself, and we do not embrace Vail's characterization of it.

14.     Admitted.

15.     Plaintiff admits that she did not inform the lift attendant at the base of the lift in 2013 that she intended to ride around the top of the lift and back down without getting off at the top, as she had in 2012. (See Plf.'s Version of Facts, ¶6).

16.     Admitted.

17.     Admitted. The signs were not as obvious though as Vail makes them out to be in its motion. (See Plf.'s Version of Facts, ¶7, for Plf.'s version of these facts).

18.     Admitted.

19.     Admitted. By the time plaintiff managed to hop off the chair, though, the ramp had descended 10" from the ideal elevation for disembarkation. (See Plf.'s Version of Facts, ¶9).

20.     Admitted.

21.     Admitted.

22.     Plaintiff denies that this is an accurate description of what she and her companions were confronted with at the top of the lift. (See Plf.'s Version of Facts, ¶¶ 8, 9, and 18, below). As well, plaintiff disputes that Vail's lift operator hit the slow button on the lift. (See Plf.'s Version of Facts, ¶ 20).

23.     Admitted.

24.     Denied. This is in error. Plaintiff almost certainly did not take 10-12 steps, but instead was approximately 10 feet past the unload bar when she managed hop off the chair, stumbled, and then was stuck from behind by the chair. (See Plf.'s Version of Facts, ¶¶ 12, 13, 14, 15, and 20).

25.     Admitted.

26.     Denied. The declining slope was very problematic for plaintiff. This caused her to have to, in Mr. Ferrara's words "hop off the chair." She thereafter stumbled and then was struck by the chair as it swung around to the left to turn down the mountain. (See Plf.'s version of Facts, ¶¶ 10, 11, 12, 13, 14, 19, and 20, below).

27.     Admitted.

28.     Admitted.

29.     Admitted. Vail has disclosed Chris Stoddard as an expert, who references what he contends to be the applicable ANSI standards at B77.1-2011, concerning appropriate actions for lift operators. (See Plf.'s Version of Facts, ¶ 24, below).

**B.     Plaintiff's Version of the Undisputed Facts**

Plaintiff submits, on the other hand, that a more accurate and comprehensive statement of

the undisputed versus disputed material facts presented in a light most favorable to the opponent

of the motion is as follows:

1.      Vail operated the Fun Park at the base of Breckenridge Peak 8, where it offered

scenic chairlift rides on the Colorado SuperChair. (Vail's Statement of Material Facts, ¶ 1). As

well it was in fact a "landowner" as contemplated by §13-21-115(1), C.R.S., i.e., "a person in

possession of real property [or] legally responsible for the activities conducted or circumstances

existing on real property."

2.      Plaintiff and her adult daughter, Elizabeth Pyle, had previously visited the Fun

Park while on vacation in June 2012, rode the Colorado SuperChair, and before boarding *in*

*2012*, signed a release of liability form. (Def.'s Mot., Ex. 3). During the following year on June

25, 2013, however, when plaintiff again travelled to the State of Colorado from Texas with her

daughter and future son-in-law, Jason Pyle, and decided to again enjoy the scenic ride up the

Colorado SuperChair, she did **not** again sign a release agreement, but instead was not asked to

nor did she sign anything. (Ex. A, Dep. of Carolyn Raup, at 33:15 – 36:19; Ex.  B, Dep. of

Elizabeth Raup, at 80:4 – 83:13).

3.      Instead, in 2013 plaintiff merely purchased or had purchased for her by her

daughter a lift ticket. (*Id.*, Ex. G).  Although trying to be cooperative in her deposition, plaintiff

testified that she had seen the front side of the lift ticket, this is questionable since it is clear that

her daughter went into the hut and purchased the lift tickets together with Mr. Pyle, and the party

thereafter proceeded to the chairlift where her daughter likely presented the tickets to the lift

operator at the bottom of the lift. (*Id.*; see also Pl.'s Aff., Ex. G hereto).  Thus, whether plaintiff

in fact even looked at the front side of the ticket is a disputed fact.  Plaintiff clearly, on the other

hand, testified that she did *not* look at the backside of the lift ticket. (Def.'s Mot., Ex. 1, p. 8).

4.      The images of the lift ticket on Ex. 4 appear to be their actual size.  If one looks very closely, in tiny language on the very end of the front of the lift ticket and likely in no more than 5 point font, the lift ticket stated (using 5 pt. font and not the 14 point font that Vail uses in its motion): "IMPORTANT WARNING ON REVERSE".  Nowhere on the front of the lift ticket, even in the font that was used, however, is there a reference to a "release" or "release agreement."  If one, however, ventures further and decides to read in detail the equally tiny print on the back, it states what Vail quotes it as saying, except (again) in likely no more than 5 pt. font, and not the 12 pt. font that Vail uses in its motion. As well, the title on the reverse side of the ticket does not say "release," but again says: "warning."

5.      Plaintiff got on the chairlift and rode with her daughter and Mr. Pyle, after the operator at the bottom of the chairlift was presented the lift tickets. (Def.'s Mot., "Statement of Material Facts," ¶ 11).

6.      In 2012, when plaintiff and her daughter rode up the same chairlift they had not gotten off at the top, but instead stayed on the chair and rode back down to the bottom of the lift without getting off. (Ex. A, at 16:14-22; Ex. B, at 53:14-19, and 57:20-22).  Among other things, plaintiff's daughter, Elizabeth, has testified that she is afraid of heights, and would not have gotten on the chairlift if she felt this option was not available to her. Since no one told them any differently, they intended to do the same thing in 2013. (Ex. B, at 100:20-101:7).  Although Vail cites the fact that plaintiff and her daughter didn't ask for permission to do such in 2013 (as they had in 2012 (*Id.*, p. 87: 22-88:1)), Vail as well points to no sign or other advisement that would have told them that they couldn't do such.

7.      After enjoying what they believed to be the scenic ride up the mountain, Ex. 5 to

Def's Mot. depicts the two yellow signs on the vertical support that they passed by immediately

before the unloading platform.  These pictures were taken by Craig Gerloff, the Health and

Safety Manager at Breckenridge, who investigated the accident for Vail after its occurrence.

(Def.'s Mot., p. 4, n.2; Ex. E, deposition of Greg Gerloff at7:9-16, and 12:1-7).  The signs were

not nearly as clear as Vail represents them in its motion, but the top sign does in fact state

"Prepare to Unload Raise Bar," and the bottom one states in smaller (and barely discernible

lettering in the picture provided by Mr. Gerloff) "Check for Loose Clothing and Equipment".

(see Def.'s Mot., at p. 5, & Ex. 5).  This was not something that was thought to be pertinent to

plaintiff, since she intended to ride the chairlift back as she and her daughter had the year before.

(Ex. B, Dep. of Elizabeth Raup, p. 87:22 - 88:1). This sign is significant to Vail's lift operators as

well, however, since they should have known that anyone who rides past the sign without lifting

the foot rest, likely doesn't intend to do such.  The sign is considerably before the unloading

area.  Thus, attentive and careful lift operators should be aware of such and alert passengers to

raise the leg rest well before the unloading zone.  Well beyond that sign, there was a vertical

stake colored in yellow stating: "Unload Here." (See Def.'s Mot., p. 5, & Ex. 5), together with a

horizontal line that extended over the unloading area. (*Id*.). After that, the ramp started declining

at a rate of one inch per foot. (See Def.'s Mot., p. 6, ¶ 19, & Ex. 5).

8.      Considerably past the "prepare to unload" sign, one of the lift operators, Ferrara,

finally began waving his arms and yelling at plaintiff and her companions to raise the foot rest

and get off the chair. The other lift attendant, Sims, described lifting motion with their hands.

(Ex. D at 23:1-4).  By Elizabeth Raup's account, they didn't get the message until they were

about five feet before the unloading bar, and were not in a position to safely raise the foot rest

and disembark before the chair proceeded past the unloading bar and began its course down a

declining slope and ultimately a sharp counterclockwise rotation to return down the mountain.

(See Elizabeth Raup Dep. testimony, at ¶ 20, below).

9.      Nevertheless, in an effort to comply with the attendants' commands, all the

passengers attempted to abruptly raise the foot rest and disembark form the chairlift as it had

proceeded beyond the unloading bar, or area where it safe to do such, and was proceeding down

a declining slope on the end of the unloading ramp.  Although Elizabeth Raup and Mr. Pyle were

able to do such without significant incident, Plaintiff was not as fortunate. She initially lost her

sandal as the foot rest was being rapidly raised, and thereafter attempted to hop off the chair as it

was approximately 10 feet past the unloading bar and approximately 10 inches higher off the

unloading platform than at the unloading bar. She almost immediately became trapped on the left

side of the platform because of her left positon on the chair as the chairlift swung around to the

left to head back down the mountain, stumbled and was struck by the chairlift, which propelled

her likely another nine feet off the platform and in the process, suffered the severe injuries to her

leg and ankle described in her complaint.  These facts are all evidenced by the following.

10.     Mr. Gerloff's report is very illuminating. In it he depicts in red (see Def.'s Mot.,

p. 6, ¶ 19 & Ex. 5) where the plaintiff first made contact with the declining platform ramp and

was struck by the chair as it was swinging around to the left on its way back down the mountain.

(Def.'s Mot., Ex. 5, p.5). This was a distance of 10' 4" from the unloading bar. (*Id.*).  Plaintiff

believes these facts to be accurate. (Pl's Aff., Ex. G hereto).

11.     At that point, the platform had declined in elevation a distance of 10 inches (one

inch per foot) from the ideal location for disembarking at the "unload here" bar, where the chair is 22 inches off the surface of the ramp.  Mr. Gerloff describes this in his report (Def.'s Mot., Ex. 5, p. 3), as follows:

- Guest sandal fell off foot while chair bar was being raised;

- Birkenstock sandal with no heel strap;

- Guests stated they thought they could just ride around the top terminal without unloading the chair;

- Guest unloaded chair 10' 4" beyond the "Unload Here" sign, bottom of chair approximately 2' 8" from walking surface at this point (10 inches below ideal loading elevation of 22 inches);

- Sue and Elizabeth [Raup] rode the same chair in summer of 2012;

- Sue was seated in the riders left position;

12.     Although Vail quotes plaintiff as testifying that she had taken 10-12 steps down the ramp before the chair struck her, this is almost certainly inaccurate as described and explained in her recent affidavit attached hereto (Ex. G).  It moreover conflicts with Mr. Gerloff's recitation of the facts as set forth in his report, and described above.  Significantly as well, Vail's lift operators Ferrara and Sims deposition testimony is enlightening, and among many other things, conflicts with this version of the facts. (See Ferrara Dep. excerpts attached hereto as Ex. C and Sims Dep. excerpts attached as Ex. D ).

13.     At the outset, with regard to where plaintiff disembarked from the chairlift, Ferrara's testimony is as follows:

        Page 29

21      Q.  Okay. And Mr. Gerloff said that based on
22  his interviewing, the orange disk is the point where
23  the injured Mrs. Raup got off the chair, and the one
24  with the X in it is where she ended up. Does that
25  appear accurate to you?

Page 30

1      A.  That appears accurate.

14.    When asked to describe the incident in his own words, Mr. Ferrara testified as follows:

Page 22

4      A.  Okay. The first thing I noticed that
5  called my attention to them was that they were coming
6  into the top terminal of the chairlift with their bar
7  still down. And so I called out to them to raise their
8  bar, because that's something that would have to be
9  done for them to unload.
10      And when that didn't happen, I remember a
11  slow was hit, and so the chair slowed down to a really
12  manageable speed for them to get off the lift. And
13  while that was happening, we got their bar to raise up.
14      And I remember her daughter and friend
15  got off before she did, and she exited the chair
16  slightly after they did. *And at that point she had to*
17  *hop down about a foot, and then proceeded to stumble*
18  *and fall.* (Emphasis added).

15.    When asked about the frequency of these types of accidents, Mr. Ferrara testified as follows:

Page 18

3      Q.  In the two summers that you worked as a
4  lift operator, other than the case that we're talking
5  about here today, do you have any other summer
6  passengers that had difficulty and fell either loading
7  or unloading on either the Colorado Super Chair or the
8  Independence Chair?

9        A.  I do remember some instances where that
10  happened.
11        Q.  And which chair was that?
12        A.  Both of them I believe. *There are quite*
13  *of large people number of people who fall getting on*
14  *and off every year.*
15        Q. Both chairs you're talking about?
16        A.  Both chairs.
17        Q.  Are you talking about summer operations?
18        A.  Summer and winter.
19        Q.  Let's try to talk more about the summer
20  operations. Do you remember other incidents in the
21  summertime of somebody falling either loading or
22  unloading on the Super Chair, Colorado Super Chair?
23        A.  I can't remember specific instances, but
24  yes, I know it happens.
25        Q.  Was it loading or unloading?

Page 19

1        A.  Both.
2        Q.  And what do you remember about those
3  incidents, how it happened?
4        A.  *I remember that I guess in the summertime*
5  *people aren't as familiar, don't know where to stand to*
6  *load, or I guess not as familiar with how the chair*
7  *comes around or something like that.*
8  *But they'll make a mistake and just trip*
9  *or fall or something like that, I don't know. But*
10  *there's -- it happens too often to remember specific*
11  *instances.* (Emphasis added).

16.     Ferrara also testified concerning the difference in the experience between winter

and summer passengers, who he knew to be typically less experienced and athletic as winter

passengers, as follows:

Page 10

10        Q.  In your experience between winter and
11  summer operations, did you notice any difference
12  between the type of patrons that were coming up and
13  their skill level in terms of using the chairs?

> 14      A.  I did. *There were a lot more people that*
> 15   *weren't used to -- or familiar with how ski lifts work*
> 16   *in general, so we do pay more attention in the*
> 17   *summertime. And, yeah, there's people that aren't*
> 18   *super familiar with it, I guess, so we give a little*
> 19   *more instruction and* ... (Emphasis added).

17.     Ferrara also confirmed that he was, in fact, waving his arms and yelling orders to

plaintiff and her two companions to immediately raise the bar and disembark from the chairlift

when it became apparent to him that they did not intend to do so, as follows:

> Page 29
>
> 5      Q.  At any time do you remember waving your
> 6   arms or making arm gestures to lift the foot rest?
> 7      A.  I believe so. If someone was coming into
> 8   the terminal and I wasn't sure if they could hear me
> 9   yet, *as a first step I would kind of make the hand*
> 10   *motion to lift the bar as I was yelling it out there.* (Emphasis added).

18.     Finally, Ferrara confirmed that the safest place to get off the chair is at the

"Unload Here" line, as follows:

> Page 32
>
> 21      Q.  And the safest place to get off that
> 22   chair would be at the "Unload Here" marker?
> 23      A.  That's correct.

This testimony was confirmed by 30(b)(6) corporate representative Susan Ellliott.  When

asked, she confirmed that the "unload here" point on the platform is designed to be the safest

place for passengers to unload.  This witness also confirmed that there is a stop gate to stop the

lift if someone does no unload at the correct point located on the downloading side of the lift.

(Ex. F, deposition of Susan Elliott, at 31:2 – 33:7).

19.     Elizabeth Raup, as well, testified that she had a recollection of the accident (Ex.

B, Deposition of Elizabeth Raup) as described,  e.g., in the following testimony:

Page 93

4        A.  I don't know what they were saying or yelling.
5    I know their gestures.  They ran out and they started
6    waving their arms and then they started going like this
7    just over and over and we had no idea what they were
8    talking about.
                            ***

Page 94

11        Q.  All right.  *So the chair was by your estimation*
12    *about 5 feet in front of it meaning it hadn't reached*
13    *the yellow line yet --*
14        *A.  Correct.*
15        *Q.  -- when you finally understood what he was*
16    *saying?*
17        *A.  Yes.*
18        Q.  Okay.  Got it.  Got it.  Got it.  And what was
19    he saying at that point?
20        A.  He was telling us to lift the bar.
21        Q.  All right.  And what did you -- you say you
22    lifted the bar in a hurry and your mom's shoe came off?
23         A.  Yes.
                            ***
Page 96

10        A.  Well, when we were -- we started to lift the
11    bar right here in the middle, so by the time we got it
12    up, we just kind of threw the bar up and it -- and her
13    foot was still on there, so the bar kind of took her
14    shoe and flung it.
15        Q.  All right.  They were telling you to lift the
16    bar.  What were you saying to them?
17        A.  We were saying, "What?  What?"  We couldn't
18    understand them.
19        Q.  Okay.
20        A.  And then they said, "Lift the bar.  Lift the
21    bar," and we all kind up of looked at each other and
22    then we lifted the bar up.
                            ***

Page 97

1       *A.  Yes, they said, "Lift the bar and get off," and*
2   *they were yelling at us.  The guy -- we didn't even*
3   *know to get off until like the unloading sign and*
4   *that's where Jason and I just jumped off and went*
5   *straight down* and then –

                        \*\*\*

Page 97

12     *Q.  All right.  Now, you say "jumped off."  Were*
13  *you able to just stand up and walk down?*
14      *A.  No.*
15      *Q.  No?*
16      *A.  No.*
17     *Q.  So you were, what, higher off the ground or*
18  *what?*
19      *A.  Well, the chair lift was still going at the*
20  *same speed.*
21      *Q.  It had not slowed down at all?*
22      *A.  No, it had not slowed down.  It pushed us all*
23  *the way down the ramp into the gravel back there.*
24     *Q.  So your recollection is the chair was going the*
25  *same speed pretty much the whole time?*

Page 98

1       *A.  Yes.*

                        \*\*\*

Page 98

10     Q.  Got it.  Did you see your mother get off the
11  chair?
12      A.  Yes.  I turned around -- as I kept going, I
13  turned -- turned back to see what had happened to her
14  because I just didn't think about it.  I just got off,
15  and I should have waited for her to get off first and
16  done that, *but I turned around and saw her get knocked*
17  *in the back and fly this direction and do a barrel roll*
18  *on top of the mountain.*

                        \*\*\*

Page 100

5        Q.  Okay.  *Did you see your mom walking or running*
6   *proceeding down the ramp at all?*
7        A.  *No.*
8        Q.  Did --
9        A.  *She had barely gotten off and then she had*
10  *probably one foot down and the chair lift hit her and*
11  *then she just went off the side of that ramp.*
12       Q.  So you all -- you all got off before her you
13  think?
14       A.  Yes, which we should not have done, but it just
15  happened so fast, we just reacted.
                                         ***

Page 104

11       Q.  Did -- your statement says, "The chair lift
12  knocked her in the bottom and she landed on the
13  concrete."  Is it your recollection that it hit her and
14  she sort of flew through the air onto the concrete?
15       A.  Yes.  *She had just barely tapped the ground*
16  *with one foot, and by the time she was putting the*
17  *other one, the chair lift had hit her in the back and*
18  *she -- her left foot was already going off the edge.*
19  So regardless if the chair hit her or not, she would
20  have fallen and hurt herself.
                                         ***

Page 111

12       Q.  *So the chair lift you think knocked her off the*
13  *side.  She didn't fall off?*
14       A.  *Yes.*

(Emphasis added).

20.    As well and as set forth in Vail's expert's, Mr. Stoddard's, March 10, 2015 report

(Def.'s Mot., Ex. 7, p. 11):

The chairs pass through the top terminal on rails and turn 180 degrees around to
go back down the mountain.  The chairlift is equipped with a stop gate located
where the chairs make this turn.  It will automatically stop the chairlift if people

are detected to have remained on the chairseat rather than to have disembarked, or if the restraining bar is lowered.

21.     Thus, at least in 2013, the lift attendants knew or should have known that if they did nothing, the chairlift would have automatically stopped itself if it had gone past the stop gate with the footrest down, with plaintiff and her companions still safely onboard.

22.     Further, also as depicted in the diagram in Mr. Gerloff's report (at p. 6), before the stop gate is reached, the chairlift swings rapidly to the left, creating a risk that a person who jumps off the chair 10 feet past the unloading bar and is in the left hand seat, might likely become trapped on the left side of the ramp and struck by the chair as it swings around to head down the mountain, exactly as plaintiff was.

23.     Although what "reasonable care" is, is clearly something within the common understanding of lay persons, Vail's expert, Mr. Stoddard, is also of assistance, when he references in his report the ANSI (American National Standards Institute) standards (which were incorporated into Colorado law by virtue of the Tramway Act). Although these standards are not exclusive considerations concerning what reasonable care is (see discussion below in § IV. A., and *Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 930 (Colo. 1997)), they are relevant considerations. In this regard, Mr. Stoddard notes that ANSI  B77.1-2011, states with regard to a lift operator's duties the following:

> [T]o monitor the passengers' use of the aerial lift; including observing, advising and assisting them while they are in the attendant's work area as they embark on or disembark from the aerial lift; and to respond to unusual occurrences or conditions as noted.  The attendant should respond by choosing an appropriate action, which may include any of the following.

        1) assisting the passenger;
        2) slowing the aerial lift (if applicable);
        3) stopping the aerial lift;
        4) continuing operation and observation.

*Id.* at p. 12.

24.      Those four duties and alternative courses of action, in fact, cover most of

plaintiff's contentions in terms of how a reasonably careful lift operator should have reacted to

her dilemma at the top of the chairlift, "to protect [her] against dangers which Vail actually knew

or should have known."

25.      Not included in this list, however, is the equally relevant consideration that

preceded all this, which is the duty of a reasonably careful lift operator to be vigilant and not

wait until the last moment to direct persons to unload, but instead do such in a timely fashion

soon after the passengers had passed by the "prepare to unload" sign.

26.      Mr. Stoddard also describes in his report the duties of passengers as follows:

People on the chairs are expected to observe and follow the requirements of the
State of Colorado Ski Safety Act, section: "33-44-105 Duties of Passengers'" and
section "3.3.6 Passenger Conduct and Responsibility" of the American National
standard B77.1-2011.

This includes the duty of passengers to obey the commands of the lift operators.

Def.'s Mot., Ex. 7, p. 12.

27.      Finally, although Vail has identified the fact that per Ferrara's and Sims'

testimony that they pushed the slow button on the lift, as undisputed (see Mot., p.7, ¶22), to the

contrary, this is instead a disputed fact. As testified to by, e.g., Elizabeth Raup:

      Page 97

      12       Q.  All right.  Now, you say "jumped off."  Were
      13   you able to just stand up and walk down?

```
14        A.  No.
15        Q.  No?
16        A.  No.
17        Q.  So you were, what, higher off the ground or
18   what?
19        A.  Well, the chair lift was still going at the
20   same speed.
21        Q.  It had not slowed down at all?
22        A.  No, it had not slowed down.  It pushed us all
23   the way down the ramp into the gravel back there.
24        Q.  So your recollection is the chair was going the
25   same speed pretty much the whole time?
```

Page 98

```
1         A.  Yes.
```

## IV. Argument

### A.  Plaintiff needs no expert to prove her statutory landowner liability claim, as defined at §13-21-115(3)(c)(I), C.R.S.

As emphasized above, the operative issue with regard to plaintiff's remaining first claim for relief is whether, given the above facts, Vail "failed to exercise reasonable care to protect plaintiff against dangers which Vail actually knew or should have known", per §13-21-115(3)(c)(I), C.R.S. This is hardly an issue exclusively within the province of experts.

Plaintiff's contentions are that Vail's lift operators, Ferrara and Sims, failed to exercise reasonable care, when they waited until considerably after plaintiff and her companions were well past the sign instructing chair riders to lift their foot rests and prepare to unload, and at the last moment ordered what was a confused middle aged woman from Texas and her two companions to immediately lift the foot rest, knocking

off plaintiff's Birkenstock sandal, and then to disembark a chairlift, which was by that time proceeding or on the threshold of proceeding down a declining ramp past the safest location to disembark. This in turn caused her to in Ferrara's own words, "hop down about a foot" from the chair, causing her to stumble and then become trapped on the left side of the unloading ramp (from her left hand position on the chair) as the chairlift was turning to the left on its way down the hill, such that she was struck from behind by the chair and propelled off the left side of the platform, finally coming to rest 9'4" from the point of the impact, but without first  suffering serious and permanent injuries to her leg and ankle.

As well, when Ferrara and Sims issued their commands late in the process, they failed to employ much safer alternatives, including those set forth in Mr. Stoddard's report, i.e., per ANSI B77.1-2011, which consisted of: assisting the passenger, stopping the chairlift, or simply doing nothing but engaging in careful observation and monitoring such that the chairlift would have automatically stopped on its own or continued on downhill, with plaintiff and her companions remaining safe in their chairs. Further, although Ferrara and Sims each testified that they hit the slow button, this is a contested fact, and not an uncontested fact as Vail has described it.

It does not take a skiing expert to asses any of this.

Generally, expert testimony is required in negligence cases when the defendant is held to a standard of care that is outside the common knowledge and experience of ordinary persons. See *United Blood Servs. v. Quintana*, 827 P.2d 509, 520 (Colo. 1992).

Clearly, the choices facing the lift attendants were not outside the common knowledge and experience of ordinary people to assess.

Further, because industry regulations may have been implicated, as contended by Vail and its expert, Mr. Stoddard, this does not thereupon create a need for expert testimony unless the regulation creates a standard outside the common knowledge and experience of ordinary persons. As set forth in *Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 930 (Colo. 1997), where the Supreme Court reversed a trial court's ruling that expert witness testimony was required to support a trespass claim involving governmental regulations, and the court noted:

> If a legislative enactment or regulation establishes the duty owed by the defendant, expert testimony is irrelevant on that issue unless the enactment or regulation itself includes a standard of care outside the common knowledge and experience of ordinary persons.

Noteworthy in this regard is one of Vail's cited cases, *Oliver v. Amity Mut. Irrigation Co.*, 944 P.2d 495, 497 (Colo. App. 1999), involving a *denied motion* by a defendant to dismiss the plaintiff's claim based upon a lack of expert testimony with regard to the design, construction, and maintenance of an irrigation ditch, repeatedly reinforces this notion and entirely undercuts Vail's arguments. As set forth by the court of appeals in rejecting the defendant's contentions:

> Defendant cites no authority, and our research has located none, requiring expert testimony to establish the standard of care for the design, construction, and maintenance of an irrigation ditch. At least one court has specifically declined to hold that expert testimony is required in such cases. See *Pine Creek Canal No. 1 v. Stadler*, 685 P.2d 13 (Wyo. 1984) (standard of care was that of a reasonable, prudent ditch owner, and court did not

need expert testimony to determine whether that standard had been
breached).

**Further, Colorado courts have declined to require expert testimony in
similar circumstances involving allegations of noncompliance with
industry standards**. See *Gerrity Oil & Gas Corp. v. Magness*, [946 P.2d
913 (Colo. 1997)] *supra* (expert testimony not required to sustain
negligence claim alleging that oil and gas operator violated regulations
concerning oil well site reclamation operations); *Palmer v. A.H. Robins
Co.*, 684 P.2d 187 (Colo. 1984)(whether defendant breached standard of
care applicable to a reasonable pharmaceutical company did not
entail specialized knowledge beyond the ken of persons of ordinary
intelligence and, thus, did not require expert testimony); *Calvaresi v.
National Development Co.*, 772 P.2d 640 (Colo. App. 1988)(expert
testimony not required where standard of care applicable to developers who
marketed unsuitable property as a residential subdivision was not beyond
knowledge and experience of average juror). (Emphasis added).

Further, to the extent that industry standards are relevant, Vail's expert, Mr. Stoddard, has

referred the parties and this court to what he believes the industry standards are.  That is, as he

states in his report with regard to a lift operator's duties, ANSI B77.1-2011 provides as follows:

[T]o monitor the passengers' use of the aerial lift; including observing,
advising and assisting them while they are in the attendant's work area as
they embark on or disembark from the aerial lift; and to respond to unusual
occurrences or conditions as noted.  The attendant should respond by
choosing an appropriate action, which may include any of the following.
    1) assisting the passenger;
    2) slowing the aerial lift (if applicable);
    3) stopping the aerial lift;
    4) continuing operation and observation.

Again, as we discuss above, the ability to assess the reasonableness of Mr.

Ferrara's choices from that list, and not ordering a confused middle aged woman to

immediately disembark from a moving chairlift well past the area where it is safe to do

such, is well within the ability and province of average jurors, and Vail's contentions

must be rejected.

Further, and of significant import, *Gerrity* makes the point that unless the statute or regulation provides that it is the exclusive test for reasonableness, it is merely additional, **non-exclusive** evidence of the standard of care, and other relevant evidence of that standard assessable by ordinary citizens must be considered. *Gerrity*, at 946 P.2d at 930. Here, there is no evidence that the ANSI standards are exclusive standards and guidelines. Thus, the additional contention by plaintiff (that Vail ignores in its brief) is that Vail's lift operators were not being diligent, but instead waited until well after it should have been clear by the operators' attentive observation that plaintiff and her group were not planning on unloading, before they issued their command for them to raise the footrest and unload, such that plaintiff and her group were compelled to unload in a clearly dangerous area to do such. Even though diligence and timeliness in monitoring passengers is not included in the list, it is clearly a relevant consideration concerning reasonable care, well within the province of ordinary jurors to assess.

Vail's resort to an out of state case, *Callister v Snowbird Corp.*, 337 P.3d 1044, 1047 (Utah Ct.App. 2014) establishes nothing different.  In *Callister*, plaintiff was hit by either a tram or something hanging from a tram and suffered injuries.  He contended that the ski area negligently failed to rope off the larger area around the tower where he was hit, failing to put up warning signs that the tram passes so low that it can hit skiers, and failing to adequately dig out the snow where he got hit.  Based upon these contentions, the Utah court of appeals agreed with the district court, which concluded that:

> [W]ithout expert testimony, the jury would have been forced to speculate about the applicable standard of care. This is so because, in the district court's words, "the issues involved in this case such as standards regarding aerial trams, the type and size of warning ropes, and the size, content and placement of warning signs,

just to name a few, are beyond the common experience of lay people."

Here, however, the standard is well defined by statute, i.e., whether Vail "failed to exercise reasonable care to protect plaintiff against dangers which Vail actually knew or should have known."  See §13-21-115(3)(c)(I), C.R.S.  This inquiry does not require industry expertise to determine. Moreover, to the extent that industry standards are relevant and exclusive (which they are not per *Gerrity*) they have been defined by Mr. Stoddard, and do not involve issues outside the common understanding of ordinary individuals.

Expert testimony, therefore, is clearly not required nor necessary. Moreover, a perhaps more significant issue is why should Mr. Stoddard in fact be allowed to testify about his opinion that the operator acted reasonably with regard to his choices, since he is merely at that point rendering opinions that any layperson could render and performing the role of an advocate under the guise of being an expert.

### B.  The Question of Whether the Lift Operators Actions Were Unreasonable Are Clearly Questions of Fact to be Determined by the Trier of Fact

Vail's next argument is that plaintiff, as a matter of law, cannot show that Vail acted unreasonably to protect her against the danger Vail actually knew or should have known concerning her disembarkation from the chairlift.  Vail's conclusion in this regard is that "plaintiff has no competent evidence creating a genuine dispute as to whether the lift attendants were negligent or the unload ramp was negligently designed." With regard to the first contention, i.e., the issue of whether the lift attendants acted reasonably under the circumstances, we have covered such in our response above, and will not repeat it, other than to say that Vail's contentions in this regard are groundless. With regard to the defective design of the unloading ramp to accommodate summer versus winter traffic, such were included in our second claim for

relief, which this court dismissed, and we have not thereby continued to pursue such a

contention, understanding it to have been dismissed.

### C. There Did Not Exist an Enforceable Agreement Between Plaintiff and Vail Whereby Plaintiff Released Them from Liability for Negligence

We agree with the accuracy of these statements:

Contractual waiver of liability clauses are recognized under Colorado law, but are construed narrowly and "closely scrutinized" to make sure that the agreement was fairly entered into and that the intention of the parties is expressed in clear and unambiguous language. *Jones v. Dressel*, 623 P.2d 370, 376 (Colo. 1981). Only agreements insulating a party from simple negligence may be recognized, and in no event will an exculpatory agreement provide a shield against a claim for willful and wanton negligence. *Id.* Moreover, even agreements purporting to insulate a party for simple negligence are "disfavored," but they are "not necessarily void as against public policy" in Colorado as long as one party is not "at such obvious disadvantage in bargaining power that the effect of the contract is to put him at the mercy of the other's negligence." See *Heil Valley Ranch v. Simkin*, 784 P.2d 781, 784 (Colo. 1989).

*Steinfield v. EmPG,Int'l, LLC*, 2015 U.S. Dist. LEXIS 101881, *7-8 (D. Colo. 2015).

The Colorado Supreme Court has instructed courts to weigh four factors when deciding whether to give effect to agreements along these lines: "(1) the existence [or nonexistence] of a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language." *Jones v. Dressel*, 623 P.2d 370, 376 (Colo. 1981).

*Espinoza v. Ark Valley Adventures, LLC*, 809 F.3d 1150, 1153 (10th Cir. 2016).

Vail spends extensive time in arguing about factors one and two. Plaintiff, however, does

not contest such. Plaintiff's contentions instead are exclusively with regard to factors three and

four. Specifically, although there was likely a meeting of the minds and contract between

plaintiff and Vail, expressed in clear and unambiguous language, that plaintiff had agreed to

release Vail from the consequences of its own negligence **in 2012** when plaintiff signed Vail's

release agreement (Ex. 3 to Def.'s Mot.), the uncontested facts demonstrate without doubt

that no semblance of such an agreement was reached that would apply to her trip up the

chairlift **in 2013**.

The third and fourth criteria of Jones are contractual criteria, i.e. whether: 3. there existed

a meeting of the minds and valid contract between plaintiff and Vail for the release of Vail for

the consequences of its own negligence; 4. expressed in the heightened standard of *Jones*, i.e., in

"clear and unambiguous language."  Vail's contentions in this regard not only fail to sustain

Vail's burden to show that such a contract existed, but demonstrate, to the contrary, that plaintiff

is entitled to have this issue determined in *her* favor pursuant, as we set forth in our cross-

motion, which we are filing contemporaneously, and references this section of our response.

As set forth in the article referenced by Vail in its motion, i.e., William R. Rapson,

Stephen A. Bain, *Recreational Waivers in Colorado: Playing at your Own Risk*, 32 Colo. Law.

77 (2003) "The third prong of a recreational waiver analysis is a contract analysis.  Ultimately,

waiver is a contract.  Thus, whether and how it will be enforced requires a garden-variety

contract analysis ….  No contract is formed where there is no meeting of the minds." A meeting

of the minds must occur with regard to all the material terms of the contract. See *Brush Creek*

*Airport, L.L.C. v. Avion Park, L.L.C.*, 57 P.3d 738, 745 (Colo. App. 2002). Taken from a

different perspective, there must be an offer that covers all of the material terms of the contract,

and an acceptance that manifests an understanding of the proposal and "mirror image"'

acceptance of the terms of such, without material alteration or modification. See Restatement

Second of Contracts, §39 "Counter-Offers," and §59 "Purported Acceptance Which Adds

Qualifications."  "Such meeting of the minds is evidenced by 'acts, conduct or words, taken in

connection with the attendant circumstances.' And is not evidenced by the subjective,

unexpressed intent of either party." *Avemco Ins. Co. v. N. Colo. Air Charter*, 38 P.2d 555, 559 (Colo. 2002). Moreover, with regard to exculpating release agreements, *Jones* defines a heightened standard, i.e., that the agreement must be expressed in "clear and unambiguous language." Here, in 2013, there existed no such thing.

In support of its contention that such a contract did exist, Vail can proffer only the front side of the lift ticket, which in the tiny print utilized (likely 5 pt. font), located at the very end of the front side, that there was a "warning" on the reverse side, which would have appeared to plaintiff as this: "IMPORTANT WARNING ON REVERSE". Under the best of circumstances, this may have alerted a very inquisitive middle aged person, who had brought along her strongest reading glasses, that there was a warning on the reverse side, but certainly not a release agreement.  Further, if one, such as plaintiff, ventured to look at the back side of the ticket, which plaintiff has categorically denied she did, there was again some more tiny language which at the top of it again said "warning," and not release. All this hardly satisfies the third and fourth criteria of *Jones*, i.e., a binding contact expressed in clear and unambiguous language. Instead, we submit that to the contrary, it is beyond reasonable dispute that it doesn't, and that it is plaintiff who should get the summary judgment as to this issue.

There is some suggestion by Vail, as well, that somehow what plaintiff signed in 2012 carried over to 2013. Using the "clear and unambiguous" criteria of *Jones*, however, the release agreement would have had to have contained clear and unambiguous language that her release of Vail from liability would not only apply to her one trip up the lift in 2012, but any other time in the future where she ventured onto Vail's property and used its chairlift. No such language exists.

This court must thereby conclude that the undisputed evidence leads to only one conclusion, i.e., that as a matter of law no such release agreement existed in 2013.

## V.  Conclusion

Vails Motion for Summary Judgment must be DENIED.

DATED this 5th day of July, 2016,

Cristiano Law, LLC


By: *s/Francis V. Cristiano*
Francis Vincent Cristiano
50 S. Steele St., Ste. 930
Denver, CO 80209
(303) 407-1777
(303) 322-9574 - FAX
frank@cristianolaw.com

The Mellon Law Firm
Joseph J. Mellon

*Attorneys for Plaintiff*

## Certificate of Service

I certify that on July 5, 2016, I electronically filed the foregoing with the Clerk using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Craig R. May   at may@wtotrial.com
Michael N. Mulvania at mulvania@wtotrial.com
Thomas A. Olsen at olsen@wtotrial.com
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202

Samuel N. Shapiro at sshapiro@vailresorts.com
Legal Department
Vail Resorts Management Company
390 Interlocken Crescent
Broomfield, CO 80021

*s/ Glen Braddy*